# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| **DAVID CARL SHAVERS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **Case No. 5:13-CV-01055-SLB** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff David Carl Shavers brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). After review of the record, the parties' submissions, and the relevant law, the court is of the opinion that the Commissioner's decision is due to be affirmed.

## I. PROCEDURAL HISTORY

Shavers applied for DIB and SSI on May 10, 2011, alleging a disability onset date of December 28, 2009. (R. 67, 152-64).[1] The Social Security Administration denied his applications on August 29, 2011. (R. 95). He requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 19, 2012. (R. 31, 115-16). The ALJ denied his applications on December 7, 2012. (R. 11).

---

[1] Citations to a document number, ("Doc. __"), refer to the number assigned to each document as it is filed in the court's record. Citations to page numbers in the Commissioner's record are set forth as ("R.__").

On January 29, 2013, Shavers petitioned the Appeals Council to review the ALJ's decision and asked for additional time to obtain a letter from his physician. (R. 8-9). The Appeals Council considered the additional evidence submitted by Shavers. (R. 1-2, 5). On April 2, 2013, the Appeals Council denied his request for review, thereby rendering the ALJ's decision the final decision of the Commissioner of Social Security. (R. 1). Shavers timely appealed to this court. (Doc. 1).

## II. **STANDARD OF REVIEW**

This court reviews *de novo* the Commissioner's conclusions of law and reviews her factual findings to determine whether they are supported by substantial evidence. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007). Substantial evidence is "relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id*. (quotation and citation omitted).

## III. **DISCUSSION**

### A.  THE FIVE-STEP EVALUATION

The Commissioner follows a five-step sequential evaluation to determine whether a claimant is disabled and eligible for DIB or SSI. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see Bowen v. City of New York*, 476 U.S. 467, 470, 106 S.Ct. 2022, 2025, 90 L.Ed.2d 462 (1986) ("The regulations for both programs are essentially the same . . ."). For the purpose of this evaluation, "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 416(i)(1)(A); *see id*. § 423(d)(1)(A).

### 1.  **Substantial Gainful Activity**

First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity" as defined by the regulations. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *see id*. §§ 404.1572, 416.972. If the claimant is so engaged, he is not disabled. *Id*. §§ 404.1520(b), 416.920(b). Here, the ALJ determined that Shavers had not engaged in substantial gainful activity since the alleged onset date of December 28, 2009. (R. 16).

### 2. Severe Impairments

If the claimant is not engaged in substantial gainful activity, the Commissioner determines whether he suffers from a severe impairment or combination of impairments that significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii) & (c), 416.920(a)(4)(ii) & (c). If the claimant does not have such an impairment or impairments, he is not disabled. *Id*. §§ 404.1520(c), 416.920(c). Here, the ALJ found that Shavers had severe impairments of a history of irritable bowel syndrome/Crohn's disease status post small bowel resection in 2003, osteoporosis, and mild degenerative disc disease/osteoarthritis/spondylosis of the lumbar spine. (R. 16).

### 3. The Listings

If the claimant has severe impairments, the Commissioner determines whether, alone or in combination, they meet the duration requirement and whether they are equivalent to any one of the listed impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *see id*. §§ 404.1523, 404.1525, 404.1526, 416.923, 416.925, 416.926. If the impairments are equivalent to one of the listed impairments, the claimant is disabled. *Id*. §§ 404.1520(d), 416.920(d). Here, the ALJ found that Shavers' impairments, alone and in combination, were not equivalent to one of the listed impairments. (R. 16).

### 4.  Residual Functional Capacity and Past Relevant Work

If the impairments are not equivalent to one of the listed impairments, the Commissioner assesses the claimant's residual functional capacity ("RFC"), which is the most the claimant can do despite the limitations.  20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(1), 416.920(a)(4)(iv), 416.945(a)(1).  She considers all of the claimant's medical impairments in determining the RFC.  *Id*. §§ 404.1545(a)(2), 416.945(a)(2).  Then, she determines whether, considering the RFC, the claimant can perform his past relevant work.  *Id*. §§ 404.1520(a)(4)(iv) & (f), 416.920(a)(4)(iv) & (f).  If the claimant is capable of performing his past relevant work, he is not disabled.  *Id*. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Here, the ALJ determined that Shavers could perform light work and could lift or carry up to 20 pounds occasionally and up to 10 pounds frequently.  (R. 17).  He could stand or walk for six hours and sit for eight hours in an eight-hour work day with normal breaks.  He could not push or pull with his left arm above shoulder level, but had no other limitations on pushing and pulling.  He could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  He could not climb ladders, ropes, or scaffolds, and had to avoid concentrated exposure to extreme cold, extreme heat, and humidity.  He needed to avoid concentrated exposure to hazardous conditions, such as moving machinery and unprotected heights.  (*Id*.).

The ALJ consulted a Vocational Expert ("VE") to determine whether Shavers could perform his past relevant work, considering his RFC, age, education, and work experience.  (R. 84-85).  The VE testified that Shavers could perform his past relevant work as a cashier and electronics technician at this RFC.  (R. 83-85).  Based on this testimony, the ALJ found that Shavers could perform his past relevant work and was not disabled.  (R. 20).

4

### 5.  Other Work in the National Economy

Because the ALJ determined that Shavers was not disabled at step four, she did not consider whether he could perform other work that existed in substantial numbers in the national economy.  *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c)(1), 416.920(a)(4)(v), 416.960(c)(1); (R. 20).

## B.  SHAVERS'S CLAIMS

### 1.  Weight afforded to treating physician's opinion

Shavers argues that the ALJ should have given controlling weight to the opinion of his physician, Dr. Charles Hood.  (Doc. 9 at 6-7).

In assessing RFC, the Commissioner may consider the opinions of "acceptable medical sources," such as physicians, and "other sources," such as nurse practitioners. 20 C.F.R. §§ 404.1513(a) & (d)(1), 416.913(a) & (d)(1).  In weighing these opinions, the Commissioner considers whether, and the extent to which, the source examined and/or treated the claimant, the evidence supporting the opinion, whether the opinion is consistent with the record, and the source's specialty.  *Id*. §§ 404.1527(c), 416.927(c).  She gives a treating physician's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  *Id*. §§ 404.1527(c)(2), 416.927(c)(2).  She may decide not to give a treating physician's opinion controlling weight when it is not supported by the evidence or the evidence supports a contrary finding, or when it is conclusory or inconsistent with the physician's own medical records.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  The Commissioner must clearly articulate her reasons for disregarding the opinion of a treating physician.  *Id*.

The determination of the claimant's RFC and whether he is disabled is reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d). She gives no special significance to opinions from medical sources on these issues. *Id*. §§ 404.1527(d)(3), 416.927(d)(3). She considers an RFC assessment done by a non-examining state agency physician as relevant to what the claimant can do. *Id*. §§ 404.1513(c), 416.913(c).

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

*Id*. §§ 404.1567(b), 416.967(b).

Here, substantial evidence supports the ALJ's weighing of the evidence and assessment of Shavers's RFC. On June 12, 2001, a radiologist reviewed Shavers's bone density tests and determined that he had significant osteoporosis. (R. 361). The doctor suggested that Shavers engage in weight-bearing exercises and quit smoking cigarettes. (*Id*.). In July, 2003, he underwent surgery to remove part of his intestines and his appendix, due to long-standing Crohn's disease. (R. 405).

On February 4, 2008, Shavers saw Dr. Hood, a primary care physician, for an initial visit. (R. 420). Dr. Hood noted that Shavers had past problems with Crohn's disease, trouble sleeping, and depression. (*Id*.). He visited Dr. Hood again on April 21, 2008, complaining of sinus problems. (R. 432). He returned on June 16 and July 21, 2008, for refills of his medication. (R. 425, 427). On November 10, 2008, he complained to Dr. Hood about congestion and sinus issues and sought refills of his prescriptions. (R. 428). On February 9, 2009, he saw Dr. Hood to get prescription

refills.  (R. 424).  He returned for refills on March 25, 2009, and requested a "B12 level." (R. 429).

On May 8, 2009, Dr. Hood gave him a B-12 shot.  (R. 423).  He returned on August 3, 2009, for a check up, which was normal.  (R. 430).  Dr. Hood refilled his prescriptions.  (*Id*.).  On September 28, 2009, and March 22, 2010, he reported to Dr. Hood that his medications worked well.  (R. 421, 431).  On both of these days, his physical examinations were normal.  (*Id*.).

On August 19, 2010, he visited Dr. Hood and complained of a "flare up" of his Crohn's disease.  (R. 418).  He had experienced pain over the previous 24 days that improved with medication.  He denied any fatigue, muscle weakness, and joint or back pain.  Dr. Hood concluded that he had regional enteritis of the large intestine. (*Id*.).

On April 6, 2011, a bone mass density test revealed that he had a low T-score for his AP and lateral spine, with a high risk of fracture.  (R. 454).  He also had a moderately low T-score for his femur with a moderate fracture risk.  (*Id*.).  The reviewing doctor at the Texas Gulf Coast Medical Group ("Medical Group") recommended certain therapies and a follow-up test in one year.  (R. 454-55).

On April 8, 2011, Shavers saw Dr. Daniel Whitman at the Medical Group regarding his Crohn's disease.  (R. 446-48).  He denied any fatigue, but reported pain in his abdomen, diarrhea, heartburn, and blood in his stool.  (R. 446-47).  He denied any back or joint pain, joint swelling, sciatica, or leg cramps.  He stated that he was not doing any osteoporosis treatment.  (*Id*.).  Dr. Whitman made secondary diagnoses of GERD, diarrhea, rectal bleeding, polyarthralgia, and osteoporosis.  (R. 446).  He prescribed medication for Shavers's Crohn's disease, GERD, and polyarthralgia, and ordered diagnostic testing.  (*Id*.).

7

On April 20, 2011, Shavers returned to the Medical Group and was examined by Dr. Michael Lyons.  (R. 449).  His physical examination was normal and he reported no fatigue, but complained of the same symptoms from his prior visit.  (R. 449-50).  Dr. Lyons counseled him regarding his smoking and needed weight loss and prescribed medication for his osteoporosis.  (R. 449).

On July 26, 2011, Dr. James Tran performed a consultative examination on Shavers.  (R. 462-65).  Shavers said that he continued to smoke cigarettes.  (R. 462).  Dr. Tran noted that he was well-nourished, had a normal abdomen and extremities, and was ambulatory without an assistive device.  (R. 462-63).  He could tiptoe, ambulate on his heal, and squat.  (R. 463).  He had a range of motion in his back of 50 percent.  His joints in his hands were tender, but there was no gross swelling or edema.  His knee, hip, and ankle examination was unremarkable, and he was otherwise normal.  (R. 462-63).

An X-ray of his left hand showed no radiographic abnormality, and an X-ray of his lumbar spine showed mild degenerative spondylosis.  (R. 463).  He could sit, stand, ambulate, and use his upper extremities.  He could adequately control the pain in his hand.  He experienced no significant lower-back pain, spasm, or loss of motion.  He had no gross joint deformity, bone or tissue disruption, or significant tenderness, other than that of the bilateral hand.  He had no crepitus, redness, or joint effusion.  He had no motor loss and had normal strength in his upper and lower extremities.  His grip strength was normal.  (*Id*.).

A state agency physician conducted an RFC assessment on August 26, 2011.  (R. 466-73).  He concluded that Shavers could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds.  (R. 467).  He could stand or walk about six hours in an eight-hour work day and could sit for the same.  His ability to push or pull

was unlimited.  (*Id*.).  He could climb ramps and stairs occasionally, and could not climb a ladder, a rope, or scaffolds.  (R. 468).  He could occasionally balance, stoop, kneel, crouch, or crawl.  (*Id*.).  He had no manipulative or environmental limitations. (R. 469-70).

On September 22, 2011, another state agency physician assessed Shavers's RFC.  (R. 474-81).  The physician concluded that he could frequently balance, stoop, and kneel; otherwise, the physician's assessment of his physical abilities was the same as the August assessment.  (*See* R. 475-77).  However, the physician determined that he should avoid concentrated exposure to extreme cold, extreme heat, humidity, and unprotected hazards.  (R. 478).

The following day, Shavers visited Dr. Hood, complaining that his Crohn's disease and arthritis had been worse recently.  (R. 444).  He continued to smoke cigarettes, but was trying to quit.  (*Id*.).  On October 24, 2011, he visited Dr. Hood and complained of pain in his back, which had worsened over the previous week.  (R. 443).  He stated that he continued to smoke cigarettes.  (*Id*.).  Dr. Hood ordered an X-ray regarding the reported back pain, which Shavers said extended to his right leg. (R. 441).  The X-ray showed six nonribbearing lumbar type vertebrae, discogenic degenerative disease at the lumbosacral junction, and lower lumbar facet arthropathy. (*Id*.).

On January 20, 2012, Shavers told Dr. Hood that he continued to experience the same level of pain and continued to smoke.  (R. 523).  On March 19, 2012, he visited Dr. Hood to discuss medication for his Crohn's disease.  (R. 517).  His pain remained at the same level and he continued to smoke.  (*Id*.).  He returned on May 17, 2012, complaining that the medication the doctor prescribed caused pain and swelling in his stomach.  (R. 518).  He experienced pain from his arthritis as well.  (*Id*.).  On

9

July 16, 2012, he complained to Dr. Hood of chronic pain all over from his arthritis and pain associated with his Crohn's disease. (R. 519). He stated that medication helped his pain. (*Id*.).

He visited Dr. Hood again on September 7, 2012, and stated that his pain remained about the same, but the B-12 shots helped a good deal. (R. 520). On that day, Dr. Hood wrote a statement that Shavers suffered from Crohn's disease, osteoporosis, fatigue, B-12 deficiency, depression, and hypertension. (R. 521). He continued to take his medication, but had some long-term side effects from the steroids. He was "medically disabled due to episodes of severe diarrhea and other medical problems." (*Id*.).

On January 31, 2013, after the ALJ rendered her decision in the case, Dr. Hood wrote a letter stating that Shavers had two to three flare ups of Crohn's disease each month, which caused him to be bed ridden for two to five days. (R. 528). These flare ups consisted of abdominal pain and five to seven diarrhea bowel movements per day, with bloody stool on a chronic basis. Dr. Hood did not believe that Shavers could maintain employment on a regular basis. He was unable to do repetitive movements because it caused extreme pain in his hands, lower back, neck, left shoulder, and left back rib area. (*Id*.).

Dr. Hood stated that Shavers had chronic pain in his left back due to an auto accident in 2001, that caused his ribs to be concave. (*Id*.). Pulling, pushing, bending, crawling, or twisting increased his pain, and he had to lay down a couple of times a day to alleviate the pain. He had considerable problems with walking, standing, and sitting for any significant period of time and had issues using his hands, upper left shoulder, and "rib area." (*Id*.).

With the letter, Dr. Hood provided an RFC assessment, concluding that Shavers could occasionally lift and carry ten pounds and could frequently lift and carry less than ten pounds. (R. 529). He could stand and walk about two hours in an eight-hour work day, and could sit for the same. He could sit or stand for 20 minutes before needing to change positions. He needed to walk around every 30 minutes for 15 minutes at a time. (*Id*.).

Dr. Hood stated that Shavers needed to lie down at unpredictable intervals twice during the work day. (R. 530). He could occasionally twist, stoop, and climb stairs, and could never crouch or climb ladders. His back pain and arthritis pain affected his ability to reach, manipulate, push, and pull. (*Id*.). He needed to have his legs elevated, due to his feet swelling. (R. 531). His impairments would cause him to be absent from work more than three times a month. (*Id*.).

On appeal, Shavers asserts that the ALJ should have given controlling weight to Dr. Hood's opinion. (Doc. 9 at 6-7). His assertion is without merit. The ALJ did not err in giving limited weight to Dr. Hood's opinion because it was inconsistent with Dr. Hood's medical records, which do not contain a similar assessment of Shavers's symptoms. (R. 19); *see Phillips*, 357 F.3d at 1240-41. From 2006 to 2012, Shavers primarily saw Dr. Hood for prescription refills or for unrelated illnesses. (R. 421, 423-25, 427-32, 517, 523). In his notes from Shavers's check ups over the years, Dr. Hood never reported the limitations discussed in his letter and RFC assessment. On the few occasions that Shavers complained of flare ups of his Crohn's disease and pain associated with his impairments, he told Dr. Hood that the medications were helpful, and Dr. Hood did not document any objective evidence supporting these symptoms. (R. 418, 443-44, 518, 520).

Dr. Hood's opinion is also inconsistent with the other medical records, which support the ALJ's assessment of Shavers's RFC.  The April, 2011 records from the Medical Group show that Shavers had normal physical examinations and denied any fatigue, joint pain, leg pain, back pain, or joint swelling.  (R. 446-47, 449-50).  On July 26, 2011, Dr. Tran examined him and determined that he was well-nourished; had a normal abdomen and extremities; could tiptoe, ambulate on his heal, and squat; had no significant issues with range of motion; had no gross swelling or edema in his joints and hands; and could control the reported tenderness in his hands.  (R. 462-63).  Dr. Hood's opinion is also inconsistent with the opinions of two state agency physicians, whose RFC assessments were substantially the same as that of the ALJ.  (*See* R.  467-73, 475-78).

Further, as the ALJ noted, Shavers did not seek treatment from a specialist for his Crohn's disease or arthritis when he had insurance, and he had very little treatment after the onset date.  (R.  19).  Also pertinent to the ALJ was that, despite having been advised to stop smoking tobacco for health reasons, Shavers had not complied, which suggested that his conditions were not of such severity, frequency, or duration as to warrant compliance.  (*Id*.; R. 361, 449, 462).

For these reasons, the ALJ did not err in giving limited weight to Dr. Hood's opinion, and her assessment of Shavers's RFC is supported by substantial evidence on the record.

## 2. ALJ's Credibility Finding

Shavers mentions his argument made to the Appeals Council concerning the ALJ's credibility finding as to his testimony.  (Doc. 9 at 7).  Without fully developing an argument concerning the finding, he states that his "impeccable work history and work ethic" supported his credibility.  (*Id*.).

12

To prove a disability based on a claimant's testimony as to his symptoms, the claimant must present evidence of an underlying medical condition; and either objective medical evidence confirming the severity of the symptoms, or evidence showing that the objectively determined medical condition can reasonably be expected to give rise to the symptoms. 20 C.F.R. §§ 404.1529(a), 416.929(a); *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). The ALJ must provide explicit and adequate reasons for discrediting the claimant's testimony as to his symptoms. *Wilson*, 284 F.3d at 1225. If the ALJ does not, the court must accept the testimony as true. *Id*.

When the ALJ determines that an underlying impairment reasonably could be expected to produce the symptoms the claimant describes, he evaluates the intensity and persistence of the symptoms to determine the extent to which they affect the claimant's ability to work. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). Throughout this evaluation, the ALJ considers a range of medical and other evidence, such as evidence of the claimant's daily activities, side effects of medication used to treat the symptoms, and measures the claimant takes to alleviate the symptoms. *Id*. §§ 404.1529(c)(3), 416.929(c)(3).

Here, Shavers submitted a Function Report that he completed in May, 2011. (R. 203-10). He stated that he had trouble putting on his pants, socks, and shoes, and required frequent visits to the bathroom. (R. 204). He prepared meals daily, did laundry, and shopped for groceries. (R. 205-06). He could count change, handle a savings account, and use a checkbook and money orders. (R. 206). He watched television, read, and talked on the phone with his family. (R. 207). He had a good ability to pay attention and follow instructions. (R. 208).

At the administrative hearing, he testified that he had severe diarrhea, bleeding, and pain and bloating in his abdomen once or twice a month, which lasted two to six days.  (R. 42).  He had to take medication and stay in bed for relief.  (R. 43).  Even when he was not having a severe issue with his Crohn's disease, he still had diarrhea and trouble controlling his bowels.  (R. 43-44).  He had to time his trips out of the house and ensure that a bathroom would be available.  (R. 43).

He testified that his arthritis caused constant pain in all of his joints.  (R. 44-45).  Pain medication provided relief, and he experienced a level of pain of two out of ten on a daily basis.  (R. 45-46).  Due to fatigue caused by his Crohn's disease, he could only walk a block before needing to sit.  (R. 46).  He could stand for 20 to 30 minutes, and could only sit for 30 minutes before experiencing pain from his arthritis.  (R. 46-47).  He could drive short distances.  (R. 47).  He needed to lie down two to three times a day for one and a half hours to relieve the pain from his arthritis.  (R. 48).  His medication caused him to have muscle spasms and cramps in his hands and feet.  (R. 48-49).

He had not seen a gastroenterologist since 2004, partly because he did not have insurance.  (R. 54-55).  He also had not seen a rheumatologist for his arthritis in a long time.  (R. 58).  He did not go see a specialist when he did have insurance because he believed there was nothing that could be done.  (R. 59).  He did not wear protective undergarments.  (R. 72).  He had quit smoking four months before the hearing.  (R. 78).

The ALJ determined that his medically determinable impairments reasonably could be expected to cause some of the symptoms, but his testimony as to the intensity, persistence, and limiting effects was not credible, as it was inconsistent with the medical evidence, his own testimony, and the Function Report.  (R. 18).  This

14

finding is supported by substantial evidence.  Shavers provided no objective medical evidence supporting his account of the severity and duration of his flare ups of Crohn's disease or his assertion that he experienced constant, all-over pain from his arthritis.  *See Wilson*, 284 F.3d at 1225.  As the ALJ noted, his statement that he did laundry, prepared meals, went grocery shopping, and did not wear protective undergarments, also undermine his account of the severity of his symptoms.  (R. 72, 205-06).  Moreover, his testimony as to his symptoms and limitations was very similar to the opinion of Dr. Hood, which this court explained is contradicted by the medical record.

### 3.  The Appeals Council's Consideration of New Evidence

Finally, Shavers argues that the Appeals Council should have remanded to the ALJ to consider Dr. Hood's January 31, 2013 opinion.  (Doc. 9 at 8-9).  He submitted Dr. Hood's opinion to the Appeals Council, which entered the letter into the record. (R. 262-64, 528-31).  The Appeals Council fulfilled its duty to consider the new evidence and determined it did not provide a basis for changing the ALJ's decision. (R. 1-2); *see* 20 C.F.R. §§ 404.970(b); 416.1476(b).  This court has also considered Dr. Hood's opinion and concluded that the ALJ's decision is supported by substantial evidence.  *See Ingram*, 496 F.3d at 1262-66.  There is no basis for remanding to the ALJ.

## IV.  <u>CONCLUSION</u>

Based on the reasons set forth above, the decision of the ALJ, as adopted by the Commissioner, denying Shavers' claim for DIB and SSI is due to be affirmed.  An Order affirming the decision of the Commissioner will be entered contemporaneously with this Memorandum Opinion.

15

**DONE** this 10th day of August, 2015.

SHARON  LOVELACE  BLACKBURN
SENIOR UNITED STATES DISTRICT JUDGE